UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEVEN DEBORD                          )
                                       )
            Plaintiff,                 )
                                       )
            v.                         )        No. 4:12 CV 00219 CDP
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )
                                       )

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Steven Debord's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*

Claimant Debord brings this action asserting that he is disabled by a spinal injury,

carpal tunnel syndrome, hypertension, and obesity. The Administrative Law Judge

determined that Debord is not disabled. Debord appeals that decision. Because I find

the ALJ's decision is supported by substantial evidence, I will affirm the decision.

**Procedural History**

On August 5, 2009, Debord filed for Disability Insurance Benefits. The Social

Security Administration denied the application, and Debord sought a hearing. An

ALJ held that hearing on August 11, 2010. The ALJ upheld the denial of benefits in a

decision filed on January 13, 2011. A Request for a Review of Hearing Decision was timely filed, and the request was denied on December 9, 2011. Thus, the ALJ's determination stands as the final decision of the Commissioner.

## Testimony Before the ALJ

Debord testified that he was born in 1973 and that his symptoms started after he was involved in a tractor trailer accident on January 16, 2009. Debord completed the 11th grade, but he quit high school and had no additional vocational training or education. He had been employed in a number of different jobs over the years. He worked as a cottage parent at a children's center, a parts counter in a parts store, and a warehouse manager. He also had done maintenance work for the highway department, and he was a truck driver at the time of his accident. He attempted to return to work in June 2009, but he was unable to handle it and had not worked since then.

Debord testified that he injured his lower back in the January 2009 accident, for which he had a pending worker's compensation claim. Besides constant back pain, Debord said his legs and hands frequently go numb. He said he falls five or six times per week and frequently drops things. He said the physical pain has steadily gotten worse over time. Debord also complained of bad anxiety and depression. He testified that he can't drive down busy roads and that he probably has five or six

panic attacks per day. Debord said his treating physician thinks he has post-traumatic stress disorder (PTSD). Debord testified that he had not been diagnosed by a psychiatrist because he had not found one that accepted Medicaid. He also testified that his treating physician recommended a minimum of two surgeries to correct his back.

Debord testified that he spends most of his days sitting in a recliner, either watching TV or reading magazines. He said he cannot sit in a normal kitchen chair for more than five minutes. He said he can stand for up to ten minutes at a time and walk for up to five minutes before needing to sit. He cannot climb or descend stairs. He cannot bend over. He has trouble lifting a gallon of milk. He helps with loading laundry, but he cannot do dishes because of the numbness in his hands. He helps with preparing meals, but does no house cleaning or yard work. He drives once or twice a week to visit doctors. He goes grocery shopping with his wife once or twice a month. Debord testified that he never does entertainment activities outside the home other than eating out maybe once a month. He said he can count change and can use a check book. He is able to take care of some personal hygiene. He does not use a computer, but he does occasionally text on his cell phone. Debord said he has trouble concentrating and frequently forgets things.

The ALJ also heard testimony from John McGowan, the vocational expert.

McGowan found that Debord's condition would prevent him from returning to any of his previous jobs. McGowan also determined that a hypothetical claimant with Debord's educational background who could perform sedentary work could find employment in the national economy. He specifically listed three positions – semi-conductor assembly worker, medical supply packager, and optical goods assembly worker – that would be suitable for a claimant who could handle frequent use of the upper extremities, although they would not fit for someone limited to occasional use of those extremities.

### Medical Evidence

On December 5, 2008, Debord visited the office of Dr. Armela Agasino because of joint pain and back pain. The back pain was described as being moderate-severe and occurring persistently. The doctor's notes state that the trauma occurred due to a fall at home in 1993. Debord reported that the pain was aggravated by sitting, standing, and walking. He also complained of tingling in his arms and legs. An X-ray of the lumbar spine was ordered. At the time, Debord was on six different medications, including Flexeril, a muscle relaxant frequently used for neck and back pain, and Xanax, which treats anxiety disorders.

On January 16, 2009, Debord was admitted to St. John's Hospital because of lower back pain following a tractor trailer accident. He was diagnosed with a cervical

strain, a thoracic sprain and strain, and a lumbar sprain and strain.

On January 19, 2009, Debord visited Dr. Agasino again. The back pain was described as being moderate-severe and occurring persistently. This pain was attributed to the accident of January 16. Debord was assessed with cervicalgia, joint pain, and lumbago.

On February 4, 2009, Debord was examined at the St. John's Clinic in St. James. Debord still was experiencing lower back pain. The clinic scheduled an MRI of the T-12 lumbar spine for what was considered most likely an acute cervical strain.

On February 10, 2009, the MRI revealed a posterior annular tear with a central disc herniation at L5-S1, a mild annular disc bulge at L4-L5, and mild anterior wedging deformity of T12 and L1 vertebral body with mild reactive marrow edema and L1 superior endplate.

On February 17, 2009, Debord returned to the St. John's Clinic in St. James. An X-ray of Debord's right hip was performed because of his complaints about pain there. The X-ray revealed no fracture, but there was an ossification center or an old injury.

On February 19, 2009, Debord saw Dr. Sung Lee at St. John's Hospital. Dr. Lee noted an exaggerated pain response to minimal stimulation. Dr. Lee considered

this a very positive Waddell's sign that likely meant there was some degree of psychogenic overlay. Dr. Lee noted that there were mild anterior wedging conformities involving L1 and T12, but he also stated that he believed there was some symptom exaggeration. The records show Debord was alert and oriented, and he showed appropriate memory and concentration. Dr. Lee said the MRI findings were not surgical in nature and recommended conservative therapy.

On March 12, 2009, Debord saw Dr. James Jordan at the St. John's Clinic. Debord's intake form states that he had experienced muscle pain since an accident, and it also noted that he had felt anxious and down since January 16, 2009.

On March 17, 2009, Debord visited St. John's Therapy Services in St. Robert for his first scheduled therapy session. He reported continued lower back and neck pain, as well as tingling in his hands and feet. Debord denied the presence of any significant past medical history other than acid reflux. Debord exhibited excessive tightness of the hip and lower back, which the therapist said was consistent with static inactivity. The therapist recommended a treatment program focused on flexibility activities and returning to normalized motion. If the pattern of inactivity continued, the therapist said Debord would continue to develop complications due to increasing muscular tightness.

On March 27, 2009, Debord cancelled his scheduled appointment at St. John's

Therapy Services. It was the third appointment in five days that he had cancelled or failed to attend.

On March 30, 2009, Debord resumed his therapy sessions at St. John's. Over the next two weeks, he attended six other sessions. He continued to report experiencing back pain. He said the therapy helped a little.

On April 9, 2009, Debord was seen again by Dr. Jordan. Again, the duration of the back pain was dated back to the January 2009 accident.

On April 14, 2009, Debord was examined by a nurse practitioner for hypertension and anxiety. He was given a refill of his prescription for Xanax. The chart notes that Debord was not exercising regularly and not following his prescribed diet.

On April 27, 2009, Dr. Jordan cleared Debord to return to work with limitations, including not lifting, carrying, pushing, or pulling anything heavier than five pounds. Debord also was restricted from working below his knees, and he was to be allowed to vary his position as needed for comfort. A nerve conduction study was performed to test for possible carpal tunnel syndrome; it revealed a mild bilateral median neuropathy at the wrist. The ulnar nerve conduction was within normal limits for both wrists.

On May 18, 2009, Debord saw Dr. David Raskas at Saint Louis Spine Care

Alliance. Dr. Raskas agreed that Debord possibly had a wedge compression fracture of L1. He noted that Debord moved in a very guarded, somewhat exaggerated posture. Debord's range of motion of his lumbar and cervical spine was fairly restricted. Dr. Raskas noted that he was somewhat concerned about the patient's psychological reaction to his illness. He did not think Debord was capable of work at that point.

On June 3, 2009, Debord returned to Dr. Raskas. He had no explanation for the current symptoms based on the MRI and bone scan, which revealed no fractures. They did show a small central disc protrusion and mild degenerative disc disease. Dr. Raskas also noted a fair amount of functional overlay.

On June 24, 2009, Debord visited Dr. Patricia Hurford. Debord reported continued neck and back pain, as well as  severe headaches and numbness in his extremities. He also reported anxiety, hypertension and depression related to the accident. Dr. Huford found him alert and said his cognition appeared appropriate. She noted that Debord had been taking four hydrocodone per day. He initially said the medication was not helpful, but he then decided they were more helpful than not after Dr. Hurford began discussing weaning him off the medication. Her impression was that Debord had a soft tissue injury affecting his spine, but that he also had pain complaints out of proportion to objective diagnostic and physical exam findings. She

also noted poor pain coping behaviors with familial reinforcement.

On June 25, 2009, Debord was seen at Missouri Baptist Hospital in Sullivan. He reported he had accidentally stabbed himself in the chest with a knife he was holding when his legs went numb and gave out. He exhibited a limited range of motion, and his movements were guarded.

On July 9, 2009, Dr. Daniel Phillips examined Debord in St. Louis. Dr. Phillips found severe chronic sensory motor median neuropathies across the carpal tunnels. The exam revealed that the nerves and muscles in the lower extremities fell within the normal range.

On July 10, 2009, Debord visited Dr. Agasino's office. He received an increased dosage of Lisinopril, which he took for hypertension.

On July 13, 2009, Debord saw Dr. Hurford again. Debord reported continued pain in his neck, back, and hip, along with numbness in his upper and lower extremities. Dr. Hurford noted that the nerve conduction study was consistent with a diagnosis of carpal tunnel syndrome. She found no evidence of cervical radiculopathy, cubital tunnel syndrome, brachial plexopathy, lumbar radiculopathy, plexopathy, or peripheral neuropathy. The records also show Debord now was taking Prozac, a depression medication. Given the range of tests that had been conducted, Dr. Hurford explained that she was at a loss to explain Debord's severe subjective

symptoms, and surgery certainly was not necessary. She released him to regular work duty.

On November 2, 2009, Debord received a neurological evaluation in Cape Girardeau, which diagnosed him with cervicalgia, numbness, lumbar disc herniation, and lumbago. The chart reports Debord denied depression, anxiety, memory loss, mental disturbances, suicidal ideation, and hallucinations. The doctor found Debord to be alert, with an intact memory and normal attention and concentration. The doctor suggested weight loss may help, and Debord acknowledged that he already had lost thirty pounds over the previous six weeks. The report also states that Debord denied that his lower back pain occurred prior to his January 16 accident.

On February 23, 2010, Dr. Robert Bernardi saw Debord in St. Louis. Dr. Bernardi had no explanation for Debord's chronic neck, low back, bilateral arm, and bilateral leg pain. He found the most notable part of the exam was the presence of non-physiological factors suggesting symptom magnification. Debord had a profoundly elevated score on the Zung Depression Index. Dr. Bernardi acknowledged that Debord did have cervical degenerative disc disease, but he said Debord was not a candidate for any type of surgery. He found no reason for Debord to have any work restrictions.

On May 1, 2010, Debord went to the Emergency Department at Missouri

Baptist Hospital in Sullivan because of back pain. He was diagnosed with lumbago and sciatica. The chart notes he was oriented and that his psychiatric condition was normal. He was not anxious or depressed.

On May 10, 2010, Dr. Hugh Schuetz reported Debord was suffering from anxiety and noted Debord was taking Prozac for depression. The doctor's report also suggested Debord had PTSD.

On May 24, 2010, Debord returned to see Dr. Schuetz to review MRI results. The tests showed a broad-based central disc protrusion at L5-S1, resulting in impingement. There also was a small focal central disc protrusion with annular tear at L 4-5.

On June 7, 2010, Debord went to the Emergency Department at Missouri Baptist Hospital in Sullivan because he said he needed more pain medication. Debord's mental status was recorded as alert with an affect that is calm. He was oriented and coherent.

On June 15, 2010, Debord went to the Emergency Department at Missouri Baptist Hospital in Sullivan after a fall to make sure he didn't break his knee. An X-ray revealed no fracture. Debord was alert, cooperative, appropriate, oriented, and coherent.

On July 5, 2010, Debord went to the Emergency Department at Missouri

Baptist Hospital in Sullivan because of pain in his left foot. The X-ray revealed a small plantar calcaneal spur. Debord was alert, cooperative, appropriate, oriented, and coherent.

On July 9, 2010, Debord returned to Dr. Schuetz. The chart notes Debord's anxiety medication was not helping.

On July 28, 2010, Debord received another MRI. This one showed minimal anterior osteophyte formation at T12-L1. Otherwise, everything else was within normal limits.

On August 2, 2010, Debord went to the Emergency Department at Missouri Baptist Hospital in Sullivan because of pain in his right shoulder. Debord said he had fallen and injured himself the night before. Tests revealed no fracture or dislocation. Debord was alert and oriented.

On January 4, 2011, Debord met with psychologist Jonathan Rosenbloom, who provided a provisional diagnosis of PTSD and major depressive disorder.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Growell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence in a social security case is less than a preponderance, but it is enough so that a reasonable mind would find it

adequate to support the ALJ's conclusion. *McKinney v. Apfel*, 228 F.2d 860, 863 (8th Cir. 2000). The court must consider both evidence that supports and evidence that detracts from the decision. *Singh v. Apfel*, 22 F.3d 448, 451 (8th Cir. 2000).

In determining whether the decision is supported by substantial evidence, the Court reviews the administrative record as a whole to consider:

> (1) the credibility findings made by the Administrative Law Judge;
>
> (2) the education, background, work history, and age of the claimant;
>
> (3) the medical evidence from treating and consulting physicians;
>
> (4) the plaintiff's subjective complaints relating to the exertional and non-exertional impairments;
>
> (5) any corroboration by third parties of the plaintiff's impairments; and
>
> (6) the testimony of vocational experts when required which is based on a proper hypothetical question.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42

U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a). The Commissioner uses a five-step procedure to determine whether a claimant is disabled.

First, the commissioner must decide if the claimant engages in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If

not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ cannot ignore the plaintiff's testimony, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). However, the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which include claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

      1. The claimant's daily activities;

      2. The duration, frequency, and intensity of the pain;

      3. Precipitating and aggravating factors;

      4. Dosage, effectiveness and side effects of medication; and

      5. Functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds the claimant's testimony is not credible and gives good reasons for the findings, the court usually defers to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

## The ALJ's Findings

The ALJ held that Debord did not suffer from a disability within the meaning of the Social Security Act. He issued the following specific findings:

1. Debord met the insured status requirements of the Social Security Act though December 31, 2013.

2. Debord had not engaged in substantial gainful activity since January 16, 2009, the alleged onset date (20 C.F.R. §§ 404.1571 et seq.).

3. Debord had the following severe impairments: disorders of the cervical, thoracic, and lumbar spine, discogenic and degenerative; bilateral carpal tunnel syndrome, worse on the right; hypertension; and obesity (20 C.F.R. § 404.1520(c)).

4. Debord did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. Debord had the residual functional capacity to do the following: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; sit (with normal breaks) for a total of 6 hours in an 8–hour workday; and unlimited ability to push and/or pull (including operation of hand and/or foot controls); occasionally climb ramps and stairs, balance, and

stoop; never kneel, crouch, crawl, or climb ropes, ladders, or scaffolds; perform no overhead work; frequently, but not constantly, use his upper extremities for reaching, handling, and fingering; and he should avoid exposure to workplace hazards, such as unprotected heights, dangerous moving machinery, and operation of any moving equipment, as well as avoiding concentrated exposure to cold and vibration.

6. Debord was incapable of performing past relevant work (20 C.F.R. § 404.1565).

7. Debord was born on September 9, 1973, making him 35 years old at the time of decision. He was defined as a younger individual age 18-44 on the alleged disability onset date (20 C.F.R. § 404.1563).

8. Debord had a "limited" level of education, as defined by the Regulations, and was able to communicate in English (20 C.F.R. § 404.1564).

9. Using the Medical-Vocational Rules as a framework supported a finding that Debord was "not disabled," whether or not he had transferable job skills (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Jobs that Debord can perform exist in significant numbers in the national economy, considering his age, education, work experience, and residual functional capacity. (20 C.F.R. §§ 404.1569 and 404.1569(a)).

11. Debord had not been under a disability, as defined in the Social Security Act, from January 16, 2009 through the date of the ALJ's decision (20 C.F.R. § 404.1520(g)).

## Discussion

When reviewing the denial of Social Security benefits, a court must determine whether there is substantial evidence on the record to support the ALJ's decision. 42 U.S.C. 405(g). Debord asserts two points of error. First, he argues that the findings of Residual Functional Capacity are not supported by medical evidence. Second, he argues that the ALJ's decision is not supported by substantial evidence because the hypothetical question to the vocational expert did not capture the concrete consequences of his impairment.

### 1. Medical Evidence

The first claimed error is that no medical evidence supports the ALJ's finding of Residual Functional Capacity. Specifically, Debord claims the ALJ did not properly consider his mental health issues.

The ALJ did consider Debord's mental health issues and found they did not create more than a minimal limitation in his ability to perform work. Some medical evidence supports this finding.

Medical evidence includes medical records and observations apart from

statements by the claimant. 20 C.F.R. §§ 404.1512(b)(1), 404.1528(b) (2012). For mental health issues, these observations may include things such as whether the patient was "attentive, alert, focused, and appropriate." *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010). The record is replete with observations that Debord was alert, oriented, and appropriate during examinations. Multiple health providers also noted that he showed normal attention, concentration, and memory. Although the ALJ did not specifically mention these instances, a failure to cite certain evidence does not mean it was not considered, since not every piece of evidence must be discussed. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).    The ALJ also considered the observations of Dr. Hurford, who noted Debord's complaints of anxiety and depression when she examined him in June 2009. Even with these complaints in mind, Dr. Hurford saw no medical reason during her two exams to hold Debord out of work, and she cleared him to return in July 2009.

These two points are merely examples that the ALJ used "some" medical evidence to back the RFC findings as it relates to mental health limitations. Of course, the ALJ is not restricted to considering solely medical evidence. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). In assessing a claimant's residual functional capacity, the ALJ must consider the entire record. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

Key to this examination is the ALJ's credibility finding. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). Although the ALJ found the medically determinable impairments reasonably could cause the alleged symptoms, he also determined that Debord's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible.

First, they were inconsistent with his daily activities. For instance, Debord alleged he could sit no more than five minutes at a time, walk no more than five minutes at a time, stand no more than ten minutes at a time, and lift no more than a gallon of milk at a time. But the ALJ noted that Debord's actual daily activities – such as doing laundry, helping "some" in the kitchen, driving a couple of times a week, and going to the grocery store and pushing the cart – show a greater functional ability than Debord alleged.

Second, Debord's missed physical therapy appointments suggest the symptoms were not as bad as claimed.

Third, Debord's non-compliance with prescribed treatments provided a similar suggestion. Examples included Debord's failure to exercise regularly and his failure to follow his prescribed diet.

Fourth, the record "strongly suggest[s]" Debord had exaggerated symptoms and limitations. For instance, Dr. Lee noted exaggerated pain responses during his

February 2009 exam. Dr. Raskas considered Debord to have a guarded, exaggerated posture during his May 2009 visit. Dr. Hurford observed pain complaints out of proportion to objective tests in June 2009. Finally, Dr. Bernardi saw signs of symptom magnification in February 2010.

Fifth, Debord's statements and the record included significant inconsistences. On one hand, Debord testified that he needed two surgeries on his back, but the doctors who examined him found that surgery was not an option. In addition, Debord said his pain medication did not help, but when Dr. Hurford tried to wean him off it, he decided it was more helpful than not. These inconsistencies further undermined Debord's credibility in the ALJ's view. "In determining what weight to give 'other medical evidence," the ALJ has more discretion and is permitted to consider any inconsistencies found in the record." *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006).

In addition, Debord complained about anxiety issues in April 2009, and Dr. Hurford noted his complaints of anxiety and depression in June 2009. Records from his July 2009 visit to Dr. Hurford note that Debord was then taking Xanax and Prozac. But during his exam on November 2, 2009, Debord denied suffering from either anxiety or depression. At that time, he also denied suffering from memory loss, mental disturbances, suicidal ideation, and hallucinations. When Debord visited Dr.

Schuetz in May 2010, though, the doctor noted Debord was taking Prozac and still dealing with anxiety issues.

The ALJ mentioned one additional inconsistency. Debord's medical records show he visited Dr. Agasino because of back pain in December 2008 – before his tractor trailer accident – and that Debord said the pain originated from a fall in 1993. When Debord went to receive therapy in March 2009, though, he claimed he had no past relevant medical history other than acid reflux. When he received the neurological evaluation in November 2009, he again denied having back problems before the January accident. While this earlier report does not detract from any finding regarding the extent and severity of Debord's back pain, it is noteworthy when determining the credibility of Debord's testimony as a whole.

The ALJ did not "conclu[de] Plaintiff was required to see a psychiatrist or other mental health professional," as Debord contends. The ALJ simply noted that Debord had not seen one of those professionals despite doctors diagnosing some amount of functional overlay or anxiety issues. The ALJ considered this point merely as additional evidence that the complaints were not as serious or as limiting as Debord alleged.

## 2. Hypothetical Question

Debord also claims the ALJ erred because the hypothetical question posed to the vocational expert did not include any mental limitations.

However, the hypothetical question must include only the impairments which the ALJ accepts as valid. *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000). As explained previously, the ALJ found Debord's mental impairments only minimally limiting.

Even so, the second hypothetical posed to the vocational expert did, in fact, include mental limitations. The question asked about an individual who could "only understand, remember and carry out simple instructions, make only simple work related decisions, deal with only occasional changes in work processes and environment..." The expert testified that those additional limitations would have no effect on the occupations available to that person, and jobs would exist in significant number for that hypothetical individual. Thus, the ALJ properly concluded Debord could work and would not be considered disabled.

Finding no error, the ALJ's determination that Debord suffers no disability is supported by substantial evidence in the record as a whole. The decision should be upheld.

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of February, 2013.